IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| LACY M. ALLEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 3:21cv487 |
| v. | ) |
| | ) JURY TRIAL IS REQUESTED |
| COVERALL NORTH AMERICA, INC. | ) |
| d/b/a COVERALL OF RICHMOND, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**COMPLAINT**

COMES NOW Plaintiff Lacy M. Allen ("Ms. Allen"), by counsel and pursuant to Federal Rule of Civil Procedure 8(a), and states the following as her Complaint against Defendant Coverall North America, Inc., d/b/a Coverall of Richmond ("Defendant" or "Coverall"):

**PRELIMINARY STATEMENT**

1. This suit arises from Defendant's unlawful gender-based discrimination, hostile work environment and constructive discharge, and retaliation against its former employee, Ms. Allen, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII").

2. Ms. Allen has approximately ten (10) years of experience as a sales representative in the commercial cleaning industry. From February 2018 until March 2019, she worked for Coverall as a Senior Outside Sales Consultant in its Richmond Regional Support Center, located at 3850 Gaskins Road, Richmond, Virginia, 23236.

3. During her employment with Coverall, Ms. Allen's General Manager, Scott Matthews ("Matthews"), regularly subjected her to gender-based verbal abuse, sexual harassment, degradation, and other hostilities. Her Sales Manager, Brandon Ward ("Ward"), was aware of

and did nothing to prevent or ameliorate Matthews' sex-based harassment and bullying of Ms. Allen. Likewise, Coverall's upper management was notified of Matthews' abusive behavior, but they did not correct it. Rather, Ms. Allen's complaints about her hostile work environment resulted in more animosity and retaliation toward her, both Matthews and by Ward, resulting in fewer business and commission opportunities for her.

4. On or about March 1, 2019, under objectively and subjectively intolerable circumstances that made her afraid for her own safety, Ms. Allen resigned from her employment.

5. On or about December 17, 2019, Plaintiff filed a Charge of Discrimination with the Virginia Office of the Attorney General and the Equal Employment Opportunity Commission ("EEOC"), a copy of which is attached hereto as Exhibit A. Therein, she alleged sex-based discrimination, hostile work environment and retaliation in violation of Title VII. The EEOC issued her a Right to Sue Notice on Charge No. 438-2020-00140, a copy of which is attached hereto as Exhibit B, on or about April 28, 2021. Thus, both this Complaint and the assertion of Ms. Allen's Title VII claims are timely filed under applicable federal law.

6. Count I of this action is brought against Coverall for sex discrimination in the form of sex-based disparate treatment based upon Coverall's denial, to Plaintiff, of business opportunities that Coverall provided to her male comparators in similarly situated positions, in violation of Title VII, 42 U.S.C. § 2000e–2(a).

7. Count II of this action is brought against Coverall for sex discrimination in the form of its hostile work environment/ constructive discharge of Plaintiff, in violation of Title VII, 42 U.S.C. § 2000e–2(a).

8. Count III of this action is brought against Coverall for its retaliation against Plaintiff for complaining about her male colleagues' discriminatory and harassing conduct, in violation of Title VII, 42 U.S.C. § 2000e-3(a).

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of Counts I through III of this Complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of United States, specifically, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. The jurisdiction of this Court is invoked to secure protection and redress the deprivation of rights guaranteed by federal law, which rights provide for injunctive relief and other relief for illegal employment discrimination.

10. This Court has personal jurisdiction over Defendant because Coverall has substantial contacts with and conducts business within the Commonwealth of Virginia.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the unlawful employment practices alleged herein were committed in the Eastern District of Virginia, and Coverall operates and conducts business in and around the Eastern District of Virginia, including but not limited to Henrico County, Virginia.

## PARTIES

12. Plaintiff worked for Defendant as a Senior Outside Sales Consultant at its Regional Support Center in Richmond, Virginia from February 2018 until March 1, 2019. She is a citizen of the United States and currently resides in Henrico, Virginia.

13. Coverall is a franchisor of commercial cleaning franchised businesses with more than 8,000 franchisees in 90 different markets. Coverall's sales teams work at its various Support Centers, one of which is located in Richmond, Virginia. They are responsible for selling

Coverall System commercial cleaning contracts, which are in turn sold and assigned to Coverall franchisees. Coverall is a Delaware corporation with its principal place of business located at 350 SW 12th Avenue, Deerfield Beach, Florida, 33442.

14. Doing business as "Coverall of Richmond," Coverall maintains a Regional Support Center, where Plaintiff worked, at 3850 Gaskins Road, Richmond, Virginia, 23236.

15. Defendant is an "employer" within the meaning of 42 U.S.C. § 2000e. At all relevant times, Defendant was Ms. Allen's "employer," and Ms. Allen was Defendant's "employee" within the meaning of Title VII.

## FACTS

### *Coverall's Employment of Plaintiff*

16. On or about February 5, 2018, Coverall employed Ms. Allen to serve as a Senior Outside Sales Consultant working in its Regional Support Center in Richmond, Virginia.

17. Coverall hired Ms. Allen, in part, due to her six years of prior experience as a successful sales representative in the commercial cleaning industry.

18. Coverall's Outside Sales Consultants ("OSCs") are responsible for obtaining new business within their regional market, bidding on contracts for janitorial services, and presenting Coverall's services to potential customers with the goal of winning contracts.

19. As compensation for her work as a Senior OSC, Ms. Allen was promised a salary plus commissions. Ms. Allen's commissions were structured so that she could potentially increase her wages by increasing her self-generated leads per month, her total leads per month and the value of her contracts sold per month.

20. During her employment with Coverall, Ms. Allen won awards for her work performance and consistently surpassed her assigned sales quotas.

### *Allen is Harassed by Coverall's General Manager*

21. Ms. Allen is a single mother of two children.

22. Throughout her employment, Brandon Ward ("Ward") was the Sales Manager at Coverall's Richmond and Virginia Beach Regional Support Centers, and he was Ms. Allen's direct supervisor.

23. In the spring of 2018, Coverall hired Scott Matthews ("Matthews") to serve as the Richmond Regional Support Center's General Manager.  Under Matthews' misogynistic management, the office dynamic became hostile toward female employees.

24. Matthews began to regularly harass Ms. Allen and her female colleagues.  His harassment toward Ms. Allen included texting her on weekends, leaving candies and small gifts on her desk, remarking on her attire (e.g., that her shoes made her legs look nice), playing his guitar and singing to her, and even sending her love songs.

25. On one occasion, Matthews walked into Ms. Allen's area of the Richmond office, flexed his muscles and said something to the effect of, "Lacy probably hasn't ever been with a real man like me."  This remark was overheard by multiple Coverall employees.

26. After Ms. Allen failed to reciprocate Matthews' advances, he became aggressive and openly hostile toward her, regularly making derogatory comments and remarks about her and about millennial women in particular.

27. Once, when Ms. Allen received flowers at work from an unknown sender, Matthews remarked that Ms. Allen "probably sleeps around and that's why she doesn't know who sent the[ flowers]."

28. Matthews made other openly negative, gender-based comments directed at Ms. Allen and her female colleagues, including but not limited to "you women are typical millennials

5

[who] cry over everything;" "women are more dramatic and men are more reasonable;" "you women can't cook and probably feed your children Hot Pockets;" "this is why your husband abused you;" and "Lacy thinks all men are attracted to her." On one occasion, Matthews said to Ms. Allen, "You will probably go back to your ex-husband, who beat you. White women tend to do that. Black women know better." On another occasion, he said to her, "If you had been drawing your man a bath when he got home from work, like women are supposed to do, and did your job for your man . . . there wouldn't have been any 'abuse' (gesturing with air quotes). All you millennials and feminists are the same."

29. Ms. Allen's supervisor, Ward, was aware of Matthews' gender-negative comments and attitude toward Ms. Allen and her female colleagues, but he did nothing to prevent it or to protect Coverall's female employees from Matthews' hostility.

30. In June and September of 2018, Ms. Allen complained to Coverall's Vice President of Operations and Divisional Vice President of Sales about Matthews' harassment and bullying. At least two other female Coverall sales employees made similar complaints about Matthews and about Ward.

31. Upon information and belief, these complaints were forwarded to Matthews and Ward, making the women's work environment even more uncomfortable. Matthews and Ward continued with their hostilities and began to retaliate against Ms. Allen and her co-complainants. Their retaliation included, but was not limited to, denying Ms. Allen business opportunities that were provided to her male OSC colleagues.

32. At no time during Ms. Allen's employment did Coverall take sufficient affirmative action so as to effectively ensure that Matthews and Ward refrained or were

prohibited from engaging in gender-based harassment or retaliation toward Ms. Allen or her female colleagues.

### *Female Coverall Employees, including Ms. Allen, Are Denied Business Opportunities*

33. All of Coverall's OSC's are promised equal access to opportunities to increase their commissions by receiving access to business-generated sales leads and opportunities to grow the value of their closed contracts.

34. Ms. Allen and other female sales employees in the Richmond Regional Support Center learned, however, that Ms. Allen's male comparators were more frequently given internet-generated sales leads, sometimes given credit for leads they did not generate and contracts they did not close, and at least once given the opportunity to attend a national-level training event that Ms. Allen was not invited to attend.

35. Likewise, and upon information and belief, Ward and Matthews gave credit to Coverall's male OSCs for certain business leads and closed contracts, despite the men not having earned such credit, in order to increase their sales commissions. Ward and Matthews did not afford these same opportunities to Ms. Allen.

36. Separately, and on a number of occasions, Ward and/or Matthews denied Ms. Allen the opportunity to retain and/or expand the value of certain newly-closed contracts by excluding her from initial walk-through meetings with her customers. These exclusions sometimes caused the customer to cancel its contract with Coverall, costing Ms. Allen her commission entirely.

37. By way of explanation, once an OSC's contract bid is accepted by a prospective customer, the OSC passes the customer on to Coverall's Operations team, which then pairs the customer with one of Coverall's franchised business owners ("FBOs") to fulfill the contract's

services. As part of the pairing process, the Operations Team schedules a walk-through of the new customer's facility so that the FBO can better understand the new customer's needs.

38. Coverall's OSCs regularly participate in these walk-throughs with the FBO and customer, during which the OSC offers suggestions for additional services, such as routine floor care, disinfection services or deep cleaning, which might suit the customer's specific, on-site needs. By joining this walk-through process, the OSC eases the customer's transition from herself to the FBO, which in turn helps ensure that a long-term relationship is forged and gives the contract a better likelihood of success. Additionally, the OSC uses the walk-through as an opportunity to expand the customer's menu of services, which increases both the value of the contract and the size of the salesperson's commission.

39. Between November of 2018 and February of 2019, Matthews and Ward denied Ms. Allen the opportunity to participate in at least three walk-throughs with her new customers by scheduling them at times when they knew Ms. Allen could not attend. Despite her protests to the contrary, Ms. Allen lost opportunities to make additional sales to her customers during these walk-through meetings. On at least one occasion, her absence from the walk-through caused the customer to cancel the contract entirely. Upon information and belief, Matthews and Ward did not deny such walk-through opportunities to male OSCs who requested them.

40. Additionally, Ward and Matthews intentionally denied support or provided poor or rude service to some of Ms. Allen's customers, causing them to cancel their contracts and causing Ms. Allen to lose out on commissions.

### *Management Hostility toward Ms. Allen Becomes Intolerable*

41. On February 19, 2019, Ms. Allen complained to Coverall's Divisional Vice President of Sales Emilio Avila ("Avila") that Ward and Matthews had refused to permit her to

attend walk-through meetings with her new customers. Avila assured Ms. Allen that it was a routine Coverall practice to allow her to attend if she chose to do so, and he said that he would speak with Matthew and Ward.

42. On February 20, 2019, Coverall's Vice President of Operations Patrick DeMarinis ("DeMarinis") conducted a telephonic meeting that included Matthews, Ward and Ms. Allen participating together in Ward's closed-door office in Richmond and DeMarinis and Avila participating by telephone.

43. After the 10-minute telephone conference, during which Avila advised that Ms. Allen should have been included in these walk-through meetings with her customers, Matthews became angry, raised his voice, cursed, yelled at and argued with Ward, and shouted at Ms. Allen. He yelled that Ward did not "have his back" and that "men are supposed to stick together." Matthews shouted at Ward, "You're going to let a woman talk to you like that? You're going to let her win and just fold like that? Be a man!" Matthews' ranting and raving, which lasted a significant period of time, was overheard by a number of Ms. Allen's colleagues.

44. After the altercation, Ms. Allen emailed Coverall's management to say that she did not feel safe around Matthews and was afraid to return to the office on February 21, 2019. At or around the same time, another female employee from the Richmond Regional Support Center reported to management that she, too, felt unsafe around Matthews due to his history of open hostility toward her and his recent, violent, anti-female tirade.

45. In the days that followed, DeMarinis and Avila purportedly looked into the women's complaints about Matthews and Ward, but no information regarding this supposed "investigation" was reported back to Ms. Allen or her co-complainant.

46. Upon information and belief, Coverall's "investigation" purportedly led to Coverall "clearing" both men of any alleged wrongdoing, and Coverall's Richmond Regional Support Center continued with business as usual. Blatantly disregarding the women's fear for their own safety and their extreme discomfort with Matthews' misogyny and Ward's refusal to protect them, Coverall retained Matthews and Ward in supervisory and managerial roles over Ms. Allen and her female co-complainant.

47. As a result, and because Coverall had allowed their work environment to become so toxic that it was objectively and subjectively intolerable and unsafe, both Ms. Allen and her co-complainant resigned on March 1, 2019. Although both women provided Coverall with a two week notice period, during which most Richmond Regional Support Center employees transitioned their work and received going away parties and well wishes, Coverall forced Ms. Allen and her co-complainant to leave the facility – and their employment – immediately upon receipt of their resignations.

48. Thereafter, and in the wake of Ms. Allen's departure, Ward falsely and maliciously informed various Richmond Regional Support Center employees that Ms. Allen and her co-complainant were terminated for underbidding accounts and lying to customers.

49. In the months that followed, at least one other female OSC, from Coverall's Virginia Beach Regional Support Center, also resigned, in writing, citing Coverall's continued tolerance of the misogynistic and gender-based hostility of male sales managers, including Ward.

## COUNT I
### Sex Discrimination – Disparate Treatment

50. Plaintiff hereby incorporates as though fully alleged herein the allegations set forth in the foregoing paragraphs.

51.     Under Title VII, it is unlawful for any employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).

52.     Under Title VII, an unlawful sex-based employment practice is established when the complaining party demonstrates that sex was a motivating factor for any employment practice, even though other factors also motivated the practice.  42 U.S.C. § 2000e-2(m).

53.     During the course of her employment, Ms. Allen was a successful and decorated Coverall outside sales employee.  Regardless, by and through its General Manager and Sales Manager, Defendant discriminated against Ms. Allen in the terms, conditions, and privileges of her employment by affording similarly situated male comparators more business leads, contract closing credit and training opportunities than it afforded to Ms. Allen, in substantial part because of her sex.

54.     These intentional actions by Coverall's Sales Manager and General Manager denied Ms. Allen certain business opportunities, including various opportunities to earn commissions and at least one significant training opportunity, in substantial part because of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et. seq*.

55.     Coverall, through its Human Resources and upper management, knowingly failed to adequately supervise, control, discipline, and/or otherwise penalize the herein-described unlawful conduct, acts and failures to act by its Sales Manager and General Manager.

56.     Upon receipt of complaints about the foregoing disparate treatment of Ms. Allen by the Richmond Regional Support Center's General Manager and Sales Manager, Defendant failed to take all reasonable and necessary steps to eliminate such sex discrimination from the Coverall workplace and/or to prevent it from occurring in the future.

57. In so doing, Defendant created and tolerated employment conditions that were so intolerable that Ms. Allen and other female sales employees were forced to resign and thus were constructively discharged in violation of Title VII.

58. The unlawful employment practices set forth above were intentional.

59. Defendant's conduct, in denying Ms. Allen business opportunities that it provided to her similarly situated male comparators, constitutes unfair, gender-based discriminatory practices in violation of Title VII of the Civil Rights Act, 42 U.S.C. Section 2000e-2(a)(1).

60. As a direct and proximate result of Defendant's willful and wrongful discriminatory acts, Ms. Allen lost potential sales and commissions in amounts to be determined at trial, and suffered mental, emotional and physical distress.

61. As a further direct and proximate result of Defendant's violation of Title VII of the Civil Rights Act of 1964, *et seq.*, as described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of her employment relationship and has thereby incurred and will continue to incur legal fees and costs, the full nature and extent of which are presently unknown to her.

62. Ms. Allen is informed and believes, and based thereon alleges, that Defendant's conduct as described above, including but not limited to Defendant's decisions to "clear" Matthews and Ward of all wrongdoing and maintain them as management over Coverall's Richmond Regional Support Center sales staff, were willful, wanton, malicious, and done in reckless disregard for Ms. Allen's safety and well-being. By reason thereof, Ms. Allen is entitled to punitive or exemplary damages from Defendant in a sum to be decided by the trier of fact.

## COUNT II
### Hostile Work Environment/ Constructive Discharge

63. Plaintiff hereby incorporates as though fully alleged herein the allegations set forth in the foregoing paragraphs.

64. Under Title VII, it is unlawful for any employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).

65. Under Title VII, an unlawful sex-based employment practice is established when the complaining party demonstrates that her sex was a motivating factor for any employment practice, even though other factors also motivated the practice.  42 U.S.C. § 2000e-2(m).

66. During the course of Ms. Allen's employment, Defendant, through its General Manager, discriminated against her by subjecting her to unwelcome harassment on the basis of her sex.  Defendant's actions, therefore, constitute unfair discriminatory practices in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1).

67. The above-described unwelcome sex discrimination, which occurred on a regular basis throughout the course of Ms. Allen's employment with Coverall, created an intimidating, oppressive and hostile work environment toward women that interfered with Plaintiff's emotional and physical well-being and made her working conditions so intolerable that Ms. Allen became fearful for her own safety.

68. As a result of both the severe and pervasive nature of the hostile work environment perpetrated and maintained by Defendant and Defendant's failure to protect Ms. Allen and her female colleagues from such hostility, Ms. Allen suffered humiliation, emotional distress, and physical pain and suffering.

69. Moreover, Defendant knew or should have known of the harassment and discrimination.  Defendant is deemed to have known of the same because Ms. Allen complained

to management about Coverall's hostile work environment; because the harassers included Ms. Allen's General Manager and Sales Manager; and because the harassment suffered by Ms. Allen was witnessed by many of Defendant's employees, including its Sales Manager.

70. Defendant's unlawful employment practices, perpetrated by its General Manager and Sales Manager, were intentional.

71. Defendant's sex-based harassment was unwelcome to Ms. Allen, and it was so severe and pervasive that it altered the conditions of her employment and created an abusive work environment.

72. Defendant's sex-based harassment and discriminatory treatment of Ms. Allen, which were perpetrated by its General Manager and Sales Manager, were so severe and pervasive that they created a toxic and intolerable environment. This, in turn, caused a number of reasonable, female sales employees, including Ms. Allen, to feel that they had no choice but to resign from employment.

73. Defendant, through its Human Resources and upper management, negligently failed to adequately supervise, control, discipline, and/or otherwise penalize the conduct, acts, and failures to act of its General Manager, Sales Manager and others, as described above, leading Ms. Allen and other women to feel that they had no choice but to resign from employment with Coverall.

74. Defendant negligently failed to take all reasonable and necessary steps to eliminate sex discrimination and sex-based harassment and degradation from the Coverall workplace and to prevent it from occurring in the future.

75. As a direct and proximate result of Coverall's willful and wrongful discriminatory acts, Ms. Allen lost income and fringe benefits in amounts to be determined at trial, and she suffered humiliation and mental, emotional and physical distress.

76. Upon information and belief, the deliberate, calculated and oppressive actions of Ms. Allen's male manager and supervisor, who harassed and degraded her and denied her business opportunities, were intended to compel Ms. Allen to quit.

77. As a further direct and proximate result of Defendant's hostile work environment, as described, Ms. Allen has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of her employment relationship with Defendant and has thereby incurred and will continue to incur legal fees and costs, the full nature and extent of which are presently unknown to her.

78. Ms. Allen is informed and believes, and based thereon alleges, that Defendant's conduct as described above, including but not limited to Defendant's decisions to "clear" Matthews and Ward of all wrongdoing and maintain them as management over Coverall's Richmond Regional Support Center sales staff, were willful, wanton, malicious, and done in reckless disregard for Ms. Allen's safety and well-being. By reason thereof, Ms. Allen is entitled to punitive or exemplary damages from Defendant in a sum to be decided by the trier of fact.

## COUNT III
### Unlawful Retaliation

79. Plaintiff hereby incorporates as though fully alleged herein the allegations set forth in the foregoing paragraphs.

80. Plaintiff engaged in a statutorily protected activity when she complained to Defendant, on multiple occasions, that her male supervisor and manager had subjected her to sex-based harassment, disparate treatment and otherwise intolerable working conditions.

81. As a result of her internal complaints, Defendant, by and through it General Manager and Sales Manager, illegally retaliated against Ms. Allen by denying her certain business opportunities that Coverall otherwise provided to her similarly situated male colleagues, subjecting her to unwelcome sexist and derisive comments, offering poor customer service to her customers, and maligning her integrity and professional reputation by lying about the cause for her separation, solely because she reported the aforementioned sex discrimination and hostile work environment to Coverall's management.

82. Defendant had no legitimate business reasons for engaging in the aforementioned acts of retaliation. Each said act of retaliation violates Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-3.

83. As a direct and proximate result of Defendant's willful, knowing, and intentional discrimination and retaliation against Ms. Allen, she suffered and will continue to suffer pain, humiliation and emotional and physical distress. Ms. Allen has also suffered a loss of earnings and other employment benefits, in an amount to be proved at trial. She is thereby entitled to general and compensatory damages in amounts to be proven at trial.

84. As a further direct and proximate result of Defendant's retaliation in violation of Title VII of the Civil Rights Act of 1964, as described, Ms. Allen has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of her employment relationship with Defendants and has thereby incurred and will continue to incur legal fees and costs, the full nature and extent of which are presently unknown.

85. Ms. Allen is informed and believes, and based thereon alleges, that Defendant's conduct as described above, including but not limited to Defendant's decisions to "clear" Matthews and Ward of all wrongdoing and maintain them as management over Coverall's

Richmond Regional Support Center sales staff, were willful, wanton, malicious, and done in reckless disregard for Ms. Allen's safety and well-being.  By reason thereof, Ms. Allen is entitled to punitive or exemplary damages from Defendant in a sum to be decided by the trier of fact.

## PRAYER FOR RELIEF

Based on the foregoing, Ms. Allen demands judgment against Defendant in an amount that will compensate her for Defendant's violations of her rights as follows:

1. Compensatory damages in the forms of lost wages, commissions and benefits; front pay; damages for physical pain, emotional distress and humiliation, past and future; and past and future medical expenses;

2. Punitive damages to punish Defendant for its willful, wanton, oppressive, malicious, and/or grossly negligent conduct;

3. Costs expended herein, including reasonable attorneys' fees;

4. Pre-judgment and post-judgment interest; and

5. Any and all other relief to which she may be entitled.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for any and all issues proper to be so tried.

Respectfully,

LACY M. ALLEN,

By Counsel

/s/ NICHOLE BUCK VANDERSLICE
Nichole Buck Vanderslice (VSB #42637)
*Email: nvanderslice@nbvlaw.com*
LAW OFC OF NICHOLE BUCK VANDERSLICE, PLLC
9019 Forest Hill Avenue, Suite 2C
Richmond, VA 23235
Telephone: 804.272.2920
*Counsel for Plaintiff Lacy M. Allen*